**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA**

------------------------------------------------------------------------X

The Summers Group, Inc.; and Bro Biz, LLC,

          *Plaintiffs,*

      -against-

Jeffrey A. Rinde, an individual, CKR Law LLP, a
California limited liability partnership, Straightline Capital,
LLC, a Minnesota limited liability company; Ault Capital,
LLC, a Florida limited liability company, David E. Ault,
an individual, Dan Policy, an individual, Donald Hirsch,
an individual, Euwana Capital, LLC; Rick Siegel; and
Does 1 through 100, inclusive,

          *Defendants.*

------------------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**Case No. 4:23-cv-00348-DMR**

**NOTICE OF DEFENDANTS
DONALD HIRSCH AND
EUWANA CAPITAL'S
MOTION TO COMPEL
ARBITRATION**

Date: June 22, 2023
Time: 1:00 PM
Chief Magistrate Judge
Donna M. Ryu
Courtroom 4

    PLEASE TAKE NOTICE that upon the accompanying Memorandum of Law in Support

of Defendants Donald Hirsch and Euwana Capital LLC's Motion to Compel Arbitration and

Affirmation of Shaun Pollenz and the exhibits attached thereto, filed concurrently herewith, and

upon all prior proceedings, pleadings, and filings in this action, Defendants Donald Hirsch and

Euwana Capital, LLC, by and through their undersigned counsel, will move this Court, located at

the United States Courthouse for the Northern District of California, at Courtroom 4, 3rd Floor,

Ronald Dellums Federal Building, 1301 Clay Street, Oakland, CA 94612, before the Honorable

Donna M. Ryu, United States Magistrate Judge, on June 22, 2023 at 1:00 PM, for an Order

granting the following relief: (1) Compelling Arbitration as to Defendants Donald Hirsch and

Euwana Capital, pursuant to 9 U.S.C § 4, in accordance with the arbitration clause in the Escrow

Agreement from which Plaintiffs' claims arise, (2) Dismissing Defendants Donald Hirsch and

Euwana Capital in favor of arbitration, or in the alternative (3) Staying, pursuant to 9 U.S.C. § 3,

all other proceedings in this action pending issuance of a final award in arbitration, or (4) in the alternative, Extending the time for Defendants Donald Hirsch and Euwana Capital to move or otherwise respond to the Complaint to a date at least thirty (30) days after a ruling on the instant motion; and, (5) granting such other and further relief as the Court deems just and proper.

PLEASE TAKE FURTER NOTICE that the time to serve and file papers in opposition to and/or in further support of this motion shall be governed by Local Rule 7-3 and 7-4.

DATED:        May 4, 2023

POLLENZ LAW FIRM,

By: /s/ Shaun Pollenz

Shaun Pollenz, Esq.
Pollenz Law Firm
2315 Saint Pauls Sq.
Raleigh, NC 27614.
Telephone: (202) 905-3182
Shaun@PollenzLaw.com
California Bar No. 286802
*Attorneys for Defendants*
Donald Hirsch and Euwana Capital,
LLC

Denis J. McGrath (*pro hac vice forthcoming*)
CONWAY & CONWAY
99 Park Avenue, 6th Floor
New York, NY 10016
Telephone: (212) 938-1080
conwaylawclerk2@conway-conway.com
*Attorneys for Defendants*
Donald Hirsch and Euwana Capital, LLC

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA**

-----------------------------------------------------------------------X

|  |  |  |
|---|---|---|
| | : | **Case No. 4:23-cv-00348-DMR** |
| The Summers Group, Inc.; and Bro Biz, LLC, | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| -against- | : | |
| | : | |
| Jeffrey A. Rinde,  an individual, CKR Law LLP, a | : | |
| California limited liability partnership, Straightline Capital, | : | |
| LLC, a Minnesota limited liability company; Ault Capital, | : | |
| LLC, a Florida limited liability company, David E. Ault, | : | |
| an individual, Dan Policy, an individual, Donald Hirsch, | : | |
| an individual, Euwana Capital, LLC; Rick Siegel; and | : | |
| Does 1 through 100, inclusive, | : | |
| | : | |
| *Defendants*. | : | |
| | : | |

-----------------------------------------------------------------------X


**DEFENDANTS DONALD HIRSCH AND EUWANA CAPITAL'S MEMORANDUM OF
LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION**

Shaun Pollenz, Esq.
Pollenz Law Firm
2315 Saint Pauls Sq.
Raleigh, NC 27614.
Telephone: (202) 905-3182
Shaun@PollenzLaw.com
California Bar No. 286802
*Attorneys for Defendants*
Donald Hirsch and Euwana Capital, LLC

Denis J. McGrath (*pro hac vice
forthcoming*)
CONWAY & CONWAY
99 Park Avenue, 6th Floor
New York, NY 10016
Telephone: (212) 938-1080
conwaylawclerk2@conway-conway.com
*Attorneys for Defendants*
Donald Hirsch and Euwana Capital, LLC

## **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES…………...............…………...............…………................……...ii

PRELIMINARY STATEMENT…………...............…………...............…………...................1

STATEMENT OF FACTS………...………...............…………...............…………...............1

LEGAL ARGUMENT…………...............…………...............…………....................................3

    I.    The Escrow Agreement from which Plaintiffs' Claims Arise Includes a Valid
        Arbitration Clause...…....…........…...….…...….…...….…...….…...…........…...…...…..3

    II.    A Valid Arbitration Clause Must be Enforced Against a Non-Signatory Where
        Claims Arise from the Agreement Including the Arbitration Clause..………………..6

    III.    United States District Courts in the Southern District of New York Have
        Repeatedly Enforced Identical Arbitration Agreements Involving the Same Parties…9

CONCLUSION……….………………………………………………………………………..10

## **TABLE OF AUTHORITIES**

**Cases**                                                                       **Page(s)**

American Express Bank Ltd. v. Uniroyal, Inc.,
    562 N.Y.S.2d 613, 614 (1st Dep't 1990) ………...…………………………………..2, 3

Arthur Andersen LLP v. Carlisle,
    556 U.S. 624, 632, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009)…..……..…..………..6, 7

Avon Prods. v. Solow,
    150 A.D.2d 236, 238 [541 N.Y.S.2d 406……………………..……………….………4

Boyd v. Homes of Legend, Inc.,
    981 F.Supp. 1423, 1432 (M.D.Ala.1997)……………..…………………….…………6

CD Partners, LLC v. Grizzle,
    (8th Cir. 2005) 424 F.3rd 795……………………………………………….…………6

Dean Witter Reynolds, Inc. v Byrd,
    470 US 213, 217 (1985)……………………………………………...……...……………5

GE Energy Power Conversion France SAS v. Outokumpu Stainless USA, LLC,
    U.S., 140 S. Ct. 1637, 207 L.Ed.2d 1 (2020)…………….…………..…………….…………...7

Heller v. Pope,
    250 N.Y. 132, 135, 164 N.E. 881 (1928) …………………………...……………4

Hirschfeld Productions, Inc. v Mirvish,
    218 AD2d 567, 568 (1st Dep't 1995) ……………..…………………………………4

Jensen v. U-Haul Co. of California,
    (2017) 18 Cal.App.5th 295……………………………………………….……........8

Kramer v. Toyota Motor Corp.,
    705 F.3d 1122, 1128 (9th Cir. 2013)...……………………………………...…..6, 7

MS Dealer Serv. Corp. v. Franklin.,
    177 F.3d 942, 947 (11th Cir.1999)…………....………………….………………....6

PaineWebber Inc. v Bybyk,
    81 F3d 1193, 1199 (2d Cir. 1996)……………..…………….………….…...............4

Rio Algom v. Sammi Steel Co., Ltd.,
    168 A.D.2d 250, 251………………….……………………….…….........!…......….4

Shivlow v. Artex Risk Solutions,
   (9th Cir. 2020) 974 F.3rd 1057, at 1070..............…………..….………….….…...6

Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,
   10 F.3d 753, 757 (11th Cir.1993)….…………………………..….…………...….…6

Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Props., Inc. v. Robson,
   231 Ariz. 287, 294 P.3d 125, 134–35 (Ct. App. 2012)………..…………….…..……....6

Tigue v. Commercial Life Ins. Co.,
   631 N.Y.S.2d 974, 975 (4th Dep't 1995) ………..…………………………………...4

**Statutes**

9 U.S.C. § 2 (1947)….…..……………………………………………………………...5

9 U.S.C. § 3 (1947)………….……….…………………………………………………1

9 U.S.C. § 4 (1954)….…..……………………………………………………………1, 5

CPLR § 7501 ……………………………………………………………..…………...4

## PRELIMINARY STATEMENT

Defendants Donald Hirsch ("Mr. Hirsch") and Euwana Capital, LLC ("Euwana," and collectively, "Defendants") by and through their undersigned counsel, hereby submit this Memorandum of Law in Support of their Motion to (1) Compel Arbitration as to Defendants Donald Hirsch and Euwana Capital, pursuant to 9 U.S.C § 4, in accordance with the arbitration clause in the Escrow Agreement from which Plaintiffs' claims arise, (2) Dismiss Defendants Donald Hirsch and Euwana Capital in favor of arbitration, or in the alternative (3) Stay, pursuant to 9 U.S.C. § 3, all other proceedings in this action pending issuance of a final award in arbitration, or (4) in the alternative, Extend the time for Defendants Donald Hirsch and Euwana Capital to move or otherwise respond to the Complaint to a date at least thirty (30) days after a ruling on the instant motion.

## STATEMENT OF FACTS

Plaintiff filed a Complaint against Defendants Jeffrey Rinde, CKR Law LLP, Straightline Capital, LLC, David Ault, Dan Policy, Donald Hirsch, Euwana Capital, LLC, Rick Siegel, and unnamed John Does on January 24, 2023. Plaintiffs' Complaint details an alleged fraudulent loan scheme carried out by Defendants, in which Plaintiffs made an escrow payment to Defendant CKR Law LLP, in return for a promised business loan. Plaintiffs' Complaint is largely barren as to allegations in regard to Mr. Hirsch and Euwana's involvement in such scheme. Mr. Hirsch's involvement was, in fact, very limited. After being contacted by Defendant Dan Policy, who had apparently been hired in a consulting role to assist Plaintiffs in obtaining business funding, Mr. Hirsch made a referral of Plaintiffs to Mr. Rinde and Mr. Ault, and their respective corporate entities. Mr. Hirsch, in good faith, believed that Mr. Rinde and Mr. Ault would provide a business loan to Plaintiffs. In fact, Mr. Hirsch had also entered into an identical loan transaction

with the same defendants, by which Mr. Hirsch paid those defendants approximately two hundred thousand dollars ($200,000.00) of his own personal funds to obtain a similar business loan. It was only after Mr. Hirsch's own transaction was not funded that Mr. Hirsch realized the transaction he referred Plaintiffs to was illegitimate. Mr. Hirsch is actively litigating his own claims against Defendants Rinde and CKR Law, LLP in the Southern District of New York. *See Exhibit 1, SDNY Complaint*.

Plaintiffs' claims all arise from an Escrow Agreement between Plaintiffs and Defendants CKR Law LLP and Straightline Capital, LLC. Plaintiffs, in their Complaint, omit any mention of the arbitration clause included in the Escrow Agreement. While Defendants Hirsch and Euwana are not signatories to the Escrow Agreement, Plaintiffs treat them as if they are Parties to the Escrow Agreement, bringing claims for breach of the Escrow Agreement against Hirsch and Euwana, and grouping Defendants Hirsch and Euwana together with certain other Defendants, as the "Ault Defendants."[1] The Court must compel arbitration of all claims against Defendants Hirsch and Euwana, as such claims are subject to the Escrow Agreement's arbitration clause. *See Exhibit 2, Escrow Agreement*. Plaintiff's Complaint alleges that Plaintiff paid an advance fee to Defendant CKR Law LLP pursuant to the Escrow Agreement, and that Defendants allegedly failed to return such fee upon their alleged breach of such agreement. The Escrow Agreement contains an unambiguous arbitration clause requiring any and all disputes arising from that agreement or related thereto to be submitted to arbitration, as will be detailed further below. Due to the existence of such arbitration agreement between the Parties, the Court must compel arbitration of all claims against Defendants Hirsch and Euwana.

---

[1] Aside from making occasional referrals of business to Defendant Straightline, Defendants Hirsch and Euwana have no relationship to the other Defendants that Plaintiffs group them with.

## <u>LEGAL ARGUMENT</u>

**I.     The Escrow Agreement from which Plaintiffs' Claims Arise Includes a Valid Arbitration Clause**

The transaction at issue in this matter, Plaintiffs' deposit of certain funds with Escrow Agent CKR Law LLP and Defendants' subsequent alleged failure to return such funds, was governed by an Escrow Agreement executed by Plaintiffs and Defendants Straightline and CKR Law LLP. The Escrow Agreement includes the following provision entitled "Governing Law/Disputes[:]"

> "This Agreement shall be interpreted according to and subject to New York Law. The Escrow Parties agree to do their utmost to ensure that any disputes between them are settled equitably and amicably and where possible without resort to arbitration. In the event of any differences or dispute of whatever nature arising from this Agreement (which shall include any failure to agree on any matter which requires the Escrow Parties' agreement for the purposes of implementation of this Agreement) or any other matter related thereto which cannot be settled by direct negotiation within thirty (30) days after either of the Escrow Parties has notified the other parties in writing of the existence of the dispute, such differences or dispute shall be referred to and finally settled by binding arbitration in City, County and State of New York." *See Exhibit 2, Escrow Agreement at Page 7, Paragraph 16.*

The instant dispute is clearly subject to the above arbitration agreement, with which Plaintiffs have failed to comply.[2] The arbitration agreement is broad, encompassing "any differences or dispute of whatever nature arising from this Agreement… or any other matter related thereto." The arbitration clause further states that the Escrow Agreement "shall be interpreted according to and subject to New York Law." "New York follows the common law rule that, '[i]n interpreting a contract, the intent of the parties governs,' and therefore '[a] contract should be construed so as to give full meaning and effect to all of its provisions.' <u>American Express Bank Ltd. v. Uniroyal</u>, *Inc.,* 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990), <u>appeal denied</u>, 77 N.Y.2d

---

[2] Plaintiff has also failed to comply with the requirement set forth in the arbitration clause that the complaining Escrow Party notify the other Escrow Parties in writing of the existence of a dispute and engage in negotiation to settle such dispute thirty days prior to bringing an arbitration, as to Defendants Hirsch and Euwana. Thus the instant lawsuit is premature.

807, 569 N.Y.S.2d 611, 572 N.E.2d 52 (1991); see also <u>Tigue v. Commercial Life Ins. Co.</u>, 631 N.Y.S.2d 974, 975 (4th Dep't 1995) ('[T]he court must ascertain the intent of the parties from the plain meaning of the language employed.'). In interpreting a contract, '[w]ords and phrases are given their plain meaning. Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement.' <u>American Express</u>, 164 A.D.2d at 277, 562 N.Y.S.2d at 614 (citations omitted); see also <u>Heller v. Pope</u>, 250 N.Y. 132, 135, 164 N.E. 881 (1928)." <u>PaineWebber Inc. v Bybyk</u>, 81 F3d 1193, 1199 (2d Cir. 1996). The language of the arbitration clause included in the Parties' Escrow Agreement is unambiguous: the "Escrow Parties[,]" which include Plaintiffs, agreed to arbitrate "any differences or dispute of whatever nature arising from" the Escrow Agreement "or any other matter related thereto." There can be no doubt that all of Plaintiffs' causes of action in the instant dispute have arisen from the Escrow Agreement, or at a minimum are "related thereto."

New York law is clear as to the enforceability of arbitration agreements. CPLR § 7501 states "A written agreement to submit any controversy thereafter arising or any existing controversy to arbitration is enforceable without regard to the justiciable character of the controversy and confers jurisdiction on the courts of the state to enforce it and to enter judgment on an award." <u>CPLR § 7501</u>. Further, '[t]he policy of this State is to favor and encourage arbitration as a means of expediting the resolution of disputes and conserving judicial resources' (<u>Rio Algom v. Sammi Steel Co., Ltd.</u>, 168 A.D.2d 250, 251 (562 N.Y.S.2d 486), *lv denied* 78 N.Y.2d 853 (573 N.Y.S.2d 466, 577 N.E.2d 1058)). That policy 'precludes the parties to an arbitration agreement from simultaneously pursuing their claims before the courts and thus playing one forum off against the other' (<u>Avon Prods. v. Solow</u>, 150 A.D.2d 236, 238 [541 N.Y.S.2d 406] )" (*id.*). <u>Hirschfeld Productions, Inc. v Mirvish</u>, 218 AD2d 567, 568 (1st Dep't

1995), aff'd, 88 NY2d 1054 (1996). Thus, for the foregoing reasons, the Court must compel arbitration of Plaintiffs' claims against Defendants Hirsch and Euwana, pursuant to the laws of the State of New York, which govern the Escrow Agreement and any disputes thereunder.

The Federal Arbitration Act (the "FAA") further requires that the instant dispute be submitted to arbitration. "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA further provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The Supreme Court of the United States has held that "the [Federal Arbitration] Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed," and that "the Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel[.]" Dean Witter Reynolds, Inc. v Byrd, 470 US 213, 217 (1985). Here, Plaintiffs' claims arise from the Escrow Agreement, which contains an unambiguous arbitration agreement, which requires the "Escrow Parties" to arbitrate "any differences or dispute of whatever nature

5

arising from" the Escrow Agreement "or any other matter related thereto." Thus, the Court must

compel arbitration of Plaintiffs' claims relating to the Escrow Agreement, along with any

pendent claims, pursuant to the FAA.

## II.   A Valid Arbitration Clause Must be Enforced Against a Non-Signatory Where Claims Arise from the Agreement Including the Arbitration Clause

Here, it is clear that all of Plaintiffs' claims against Defendants Hirsch and Euwana arise

from the Escrow Agreement, and/or such claims are inextricably intertwined with the Escrow

Agreement. The Eighth Circuit Court of Appeals has held:

> "A nonsignatory can enforce an arbitration clause against a signatory to the agreement in several circumstances. One is when 'the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided.' MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir.1999) (quoting Boyd v. Homes of Legend, Inc., 981 F.Supp. 1423, 1432 (M.D.Ala.1997)). Another is 'when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory.' Id. (quoting Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir.1993)). 'When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.'" CD Partners, LLC v. Grizzle (8th Cir. 2005) 424 F.3rd 795 (internal quotations omitted).

The Ninth Circuit has cited the above-quoted CD Partners, LLC case, in adopting the principle

that a non-signatory may compel arbitration, holding:

> "'[A] litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement.'" Kramer, 705 F.3d at 1128 (citing Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 632, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009)). Arizona law recognizes alternative estoppel, pursuant to which a non-signatory may compel arbitration of a signatory's claims. Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Props., Inc. v. Robson, 231 Ariz. 287, 294 P.3d 125, 134–35 (Ct. App. 2012). A non-signatory may compel arbitration when 'each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement,' such that 'the signatory's claims arise out of and relate directly to the written agreement.' Id. at 135 (quoting CD Partners, LLC v. Grizzle, 424 F.3d 795, 798 (8th Cir. 2005)). As the district court concluded, all Non-Signatory Defendants may compel arbitration pursuant to this standard." Shivlow v. Artex Risk Solutions (9th Cir. 2020) 974 F.3rd 1057, at 1070.

See also, <u>GE Energy Power Conversion France SAS v. Outokumpu Stainless USA, LLC</u>, - U.S. - , 140 S. Ct. 1637, 207 L.Ed.2d 1 (2020) (held, estoppel permits enforcing arbitral agreements where the claims are intertwined with the agreement containing the binding arbitration clause). See also, <u>Arthur Anderson, LLP v. Carlisle</u>, 556 US 624, 628 (2009) (involving an arbitration clause in an investment setting, stating that "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel,[citations]'. "[t]he United States Supreme Court has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." <u>Kramer v. Toyota Motor Corp.</u>, 705 F.3d 1122, 1128 (9th Cir. 2013) (citing <u>Arthur Andersen LLP v. Carlisle</u>, 556 U.S. 624, 632, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009).

Here, Plaintiffs have relied on the written terms of the Escrow Agreement in asserting their claims against Defendants Hirsch and Euwana, which all center on the alleged failed escrow transaction. Plaintiffs in their Complaint, specifically allege that "By the Escrow Agreement, the Ault Defendants [which include Defendants Hirsch and Euwana] and the Rinde Defendants owed fiduciary duties to Plaintiffs." *See Plaintiffs' Complaint at ¶27.* Plaintiffs further allege that "In reasonable reliance on:… (b) the Escrow Agreement… Plaintiffs were induced to and, on or about September 24, 2019… did transfer by wire the sum of Twenty Thousand Dollars (US$20,000) to Straightline Capital." *See Plaintiffs' Complaint at ¶29.* Plaintiffs further allege that "In reasonable reliance on:… (b) the Escrow Agreement… Plaintiffs were induced to and, on or about October 2, 2019, did transfer by wire the Escrow Payment to CKR Law's attorney trust account[.]" *See Plaintiffs' Complaint at ¶34.* Subsequently, in

Paragraphs 35-37 of their Complaint, Plaintiffs extensively quote the Escrow Agreement in order to lay out the basis for their claims. The crux of each of Plaintiffs' claims is found in Paragraph 46 of their Complaint, which states "The conditions precedent to the release of the Escrow Payment were never met, and the loan contemplated by the transaction documents never funded. Nevertheless, Defendants released the Escrow Payment within 48 hours of its transfer to CKR Law's attorney trust account." *See Plaintiffs' Complaint at ¶46.* Each of the many claims asserted by Plaintiffs against Defendants Hirsch and Euwana (grouped in with either the "Ault Defendants" or "all Defendants" for most of Plaintiffs' causes of action), relies on the existence of the Escrow Agreement and arise from said agreement.

Additionally, to the extent the Court chooses to apply California law to this dispute, California Courts have held:

> "One treatise has stated that there are 'six theories by which a nonsignatory may be bound to arbitrate: '(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary.' (*301 Suh, supra, 181 Cal.App.4th at p. 1513, 105 Cal.Rptr.3d 585 [quoting 2 Oehmke, Commercial Arbitration (3d ed. 2006 update) § 41.57 at pp. 41-195]; see 1 Oehmke, Commercial Arbitration (3d ed. Aug. 2017 update) § 8.1 [similar].) 'The California cases binding nonsignatories to arbitrate their claims fall into two categories. In some cases, a nonsignatory was required to arbitrate a claim because a benefit was conferred on the nonsignatory as a result of the contract, making the nonsignatory a third party beneficiary of the arbitration agreement. In other cases, the nonsignatory was bound to arbitrate the dispute because a preexisting relationship existed between the nonsignatory and one of the parties to the arbitration agreement, making it equitable to compel the nonsignatory to also be bound to arbitrate his or her claim.'" (Contra Costa, supra, 47 Cal.App.4th at p. 242, 54 Cal.Rptr.2d 628.)" Jensen v. U-Haul Co. of California (2017) 18 Cal.App.5th 295.

Here, Plaintiffs allege repeatedly that their escrow payment, or some portion thereof, made pursuant to the Escrow Agreement, was transferred to the Ault Defendants (which Plaintiffs define to include Defendants Hirsch and Euwana). *See Complaint at ¶67, 76, 83, 86, 93, 98, 108, 115, 117, 132, 139, 146, 154, 164, 172, 177, 183, 189, and 193.* If Plaintiffs' allegations are to be taken as true, then Defendants Hirsch and Euwana are undoubtedly third-party beneficiaries of

the Escrow Agreement pursuant to which Plaintiffs made their escrow payment. Thus, as third-party beneficiaries of the Escrow Agreement, Defendants Hirsch and Euwana are entitled to enforce the arbitration clause included in said agreement, and Plaintiffs are bound to arbitrate their claims against Defendants Hirsch and Euwana.

### III.   United States District Courts in the Southern District of New York Have Repeatedly Enforced Identical Arbitration Agreements Involving the Same Parties

The Escrow Agreement at issue here is not unique, as Defendants CKR Law LLP and Jeffrey Rinde entered into numerous similar escrow transactions with many investors, including Defendant Hirsch, whose corporate entity, DACH Holdings, LLC, is currently a plaintiff against Defendants CKR Law, LLP and Jeffrey Rinde in a separate proceeding in the Southern District of New York. *See Exhibit 1, SDNY Complaint.* Numerous other investors have brought claims against Defendants CKR Law, LLP and Jeffrey Rinde. Several of those cases were brought in the Southern District of New York. In each of those cases,[3] Defendants moved to compel arbitration based on identical arbitration clauses within virtually identical escrow agreements to the arbitration clause and Escrow Agreement at issue here. In each case, each respective plaintiff was compelled by the Court to arbitrate their claims. See Pyne v. CKR Law LLP, et al., SDNY No. 1:21-cv-01565, and Gem City Management, Inc. v. CKR Law LLP et al., SDNY No. 1:21-cv-07676. See also, Zhongshan Tandem Plastic Products Co., Ltd. v. CKR Law, LLP, et al., SDNY No. 1:21-cv-02321, wherein the parties stipulated to arbitration after the CKR Law Defendants filed a motion to compel arbitration pursuant to another identical arbitration clause. The result here should be no different. The Escrow Agreement at the center of this dispute

---

[3] Defendant Hirsch's case, in which he is one of six (6) plaintiffs, is an exception, as Defendant Hirsch properly brought his claims in arbitration first pursuant to his escrow agreement and arbitrated his claims until the arbitration proceeding was terminated as result of Defendants CKR Law, LLP and Jeffrey Rinde's nonpayment of arbitrator fees.

contains a valid arbitration clause, and all of Plaintiffs' claims directly arise from the Escrow Agreement. Thus, although Defendants Hirsch and Euwana are not signatories to the Escrow Agreement, they have been treated as parties to the Escrow Agreement by Plaintiffs for the purposes of this lawsuit, and are Plaintiffs are bound to arbitrate their claims against Defendants Hirsch and Euwana.

## **CONCLUSION**

For the foregoing reasons, the Court must (1) compel arbitration as to Defendants Donald Hirsch and Euwana Capital, pursuant to 9 U.S.C § 4, in accordance with the arbitration clause in the Escrow Agreement from which Plaintiffs' claims arise, (2) dismiss Defendants Donald Hirsch and Euwana Capital in favor of arbitration, or in the alternative (3) stay, pursuant to 9 U.S.C. §3, all other proceedings in this action pending issuance of a final award in arbitration, or (4) in the alternative, extend the time for Defendants Donald Hirsch and Euwana Capital to move or otherwise respond to the Complaint to a date at least thirty (30) days after a ruling on the instant motion.

DATED: May 5, 2023

POLLENZ LAW FIRM,

By: /s/ Shaun Pollenz

Shaun Pollenz, Esq.
Pollenz Law Firm
2315 Saint Pauls Sq.
Raleigh, NC 27614.
Telephone: (202) 905-3182
Shaun@PollenzLaw.com
California Bar No. 286802

Denis J. McGrath (*pro hac vice forthcoming)*
CONWAY & CONWAY
99 Park Avenue, 6th Floor
New York, NY 10016

Telephone: (212) 938-1080
conwaylawclerk2@conway-conway.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF CALIFORNIA**

------------------------------------------------------------------------X

| | |
|---|---|
| The Summers Group, Inc.; and Bro Biz, LLC, | : **Case No. 4:23-cv-00348-DMR** |
| | : |
| *Plaintiffs,* | : |
| | : |
| -against- | : |
| | : |
| Jeffrey A. Rinde,  an individual, CKR Law LLP, a | : |
| California limited liability partnership, Straightline Capital, | : |
| LLC, a Minnesota limited liability company; Ault Capital, | : |
| LLC, a Florida limited liability company, David E. Ault, | : |
| an individual, Dan Policy, an individual, Donald Hirsch, | : |
| an individual, Euwana Capital, LLC; Rick Siegel; and | : |
| Does 1 through 100, inclusive, | : |
| | : |
| *Defendants.* | : |
| | : |

------------------------------------------------------------------------X

**AFFIRMATION OF SHAUN POLLENZ IN SUPPORT OF DEFENDANTS DONALD**
**HIRSCH AND EUWANA CAPITAL LLC'S MOTION TO COMPEL ARBITRATION**

STATE OF CALIFORNIA    )
                         ss:
COUNTY OF ALAMEDA    )

     I, **Shaun Pollenz**, hereby state and affirm under penalty of perjury the following:

1. I am the managing attorney for Pollenz Law Firm, Counsel for Defendants Donald Hirsch and Euwana Capital LLC ("Defendants Hirsch and Euwana").

2. I submit this Affirmation in Support of Defendants Hirsch and Euwana's Motion to Compel Arbitration.

3. Attached hereto as Exhibit 1 is a true and correct copy of a Complaint filed in the United States District Court in the Southern District of New York on behalf of Defendant Hirsch's corporate entity, DACH Holdings, LLC, together with several other plaintiffs against Defendants Jeffrey Rinde and CKR Law, LLP.

1

4.   Attached hereto as Exhibit 2 is a true and correct copy of the Escrow Agreement at issue in Plaintiffs' Complaint.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on May 5, 2023.

**WHEREFORE**, Defendants Hirsch and Euwana respectfully pray that an order be made herein (1) Compelling Arbitration as to Defendants Donald Hirsch and Euwana Capital, pursuant to 9 U.S.C § 4, in accordance with the arbitration clause in the Escrow Agreement from which Plaintiffs' claims arise, (2) Dismissing Defendants Donald Hirsch and Euwana Capital in favor of arbitration, or in the alternative (3) Staying, pursuant to 9 U.S.C. § 3, all other proceedings in this action pending issuance of a final award in arbitration, or (4) in the alternative, Extending the time for Defendants Donald Hirsch and Euwana Capital to move or otherwise respond to the Complaint to a date at least thirty (30) days after a ruling on the instant motion; and, (5) granting such other and further relief as the Court deems just and proper.

DATED: May 5, 2023

Respectfully Submitted,

By: /s/ Shaun Pollenz
Shaun Pollenz, Esq.
Pollenz Law Firm
2315 Saint Pauls Sq.
Raleigh, NC 27614.
Telephone: (202) 905-3182
Shaun@PollenzLaw.com
California Bar No. 286802

Exhibit 1

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------X

NAVCAN.DC, Inc. (previously known as Cascade Divide Data
Centers, Inc.), DACH Holdings, LLC, Silverstein Realty Group,
Inc., Silver Springs Development, Inc., GGH, Inc., and
Residencial de Chihuahua 2001, S.A. de C.V.

                                    Plaintiffs,

                -against-

Jeffrey Rinde and CKR Law LLP,

                                 Defendants.

------------------------------------------------------------------------X

:   **Case No.**

:

:   <u>**COMPLAINT**</u>

:

:   **JURY TRIAL
DEMANDED**

      Plaintiffs NAVCAN.DC, Inc. (previously known as Cascade Divide Data Centers, Inc.) ("NAVCAN/Cascade," or "Plaintiff A") DACH Holdings, LLC ("DACH," or "Plaintiff B"), Silverstein Realty Group, Inc. ("Silverstein," or "Plaintiff C"), Silver Springs Development, Inc. ("Silver Springs," or "Plaintiff D"), GGH, Inc. ("GGH," or "Plaintiff E,"), and Residencial de Chihuahua 2001, S.A. de C.V. ("Residencial" or "Plaintiff F," and collectively "Plaintiffs") by and through their undersigned counsel, bring this action for damages and other legal or equitable relief against Defendants Jeffrey Rinde ("Mr. Rinde") and CKR Law LLP ("CKR," and collectively, "Defendants"), and alleges as follows:

## I.    <u>PARTIES</u>

    1.    Plaintiff NAVCAN/Cascade is a business corporation duly authorized and existing under the laws of the state of Washington, with an address at 421 C Street, Washougal, WA 98761.

    2.    Plaintiff DACH is a business corporation duly authorized and existing under the laws of the State of Illinois, with an address at 146 W Higgins, Hoffman Estates, IL 60169.

3. Plaintiff Silverstein is a business corporation duly authorized and existing under the laws of the State of Illinois, with an address at 540 Frontage Road, Suite 3145, Northfield, IL 60093.

4. Plaintiff Silver Springs is a business corporation duly authorized and existing under the laws of the State of North Dakota, with an address at 202-402 21st Street East, Saskatoon, Saskatchewan, Canada, S7K OC3.

5. Plaintiff GGH, Inc. is a business corporation duly authorized and existing under the laws of the State of Massachusetts, with an address at 319 Newburyport Turnpike, Suite 210, Rowley, MA 01969.

6. Plaintiff Residencial is a business corporation duly authorized and existing under the laws of Mexico, with an address at Edificio Corporativo Roma, Perferico de la Juventud #6106-10, Fracc. Areadas C.P. 31215, Chihuahua, Chih, Mexico.

7. Defendant Rinde is an individual who is a citizen of New York.

8. Defendant CKR is a limited liability partnership duly authorized and existing under the laws of the State of California, with its principal office located at 1330 6th Avenue, New York, NY 10019.

## II. JURISDICTION

9. Pursuant to 28 U.S.C. § 1332(a) this Court has jurisdiction over this matter, as Plaintiffs and Defendants are citizens of Washington, Illinois, Canada, Massachusetts, Mexico, and, New York, respectively, and the amount in controversy is not less than four million twenty three thousand nine hundred fifty dollars ($4,023,950.00).

10. Each of the Plaintiffs entered into an Escrow Agreement with Defendants that included an arbitration clause.

2

11.     Plaintiffs have each satisfied their obligation to arbitrate this dispute by initiating an arbitration proceeding by filing a Statement of Claim at the American Arbitration Association (the "AAA") on October 29, 2021 and proceeding with the arbitration until it was terminated by the Panel as a result of Defendants' non-payment of arbitration fees, and Plaintiff's inability to pay the significant fees owed by Defendants, on January 14, 2023.[1] *See Exhibit 1, AAA Statement of Claim, and Exhibit 2, Termination Order.*

12.     This Court has held that an "'arbitration has been had' within the meaning of Section 3 of the FAA when an arbitral panel has terminated the proceeding for failure to pay without conducting further proceedings or granting an award." Cota v Art Brand Studios, LLC, 21-CV-1519 (LJL), 2021 WL 4864588, at *11 [SDNY Oct. 15, 2021] (Internal citations omitted).

13.     Thus, Plaintiffs have fulfilled their contractual obligation to arbitrate, the completion of the arbitration proceeding was frustrated by Defendants' misconduct in that proceeding, and Plaintiffs claims are properly before this Court.

### III.     STATEMENT OF FACTS

14.     Pursuant to Federal Rule of Civil Procedure 42, actions may be consolidated when such actions involve a common question of law or fact. *See F.R.C.P. 42.*

15.     In the instant matter, each of the Plaintiffs engaged in identical transactions governed by identical agreements with the same Defendants. Thus all questions of fact and law at issue here are common to all of the Plaintiffs.

16.     Each of the Plaintiffs in this matter entered into virtually identical Escrow Agreements with Defendants Rinde and CKR Law.

---

[1] Defendants' misconduct in continuously obstructing the arbitration proceeding, failing to comply with Panel Orders, and eventually withholding payment resulting in the termination of the arbitration proceeding, will be detailed herein.

17.     Each of the Plaintiffs made a significant escrow payment to Defendants as consideration for a promised loan.

18.     In order to induce them to enter into Escrow Agreements and make escrow payments to CKR, Mr. Rinde represented to each of the Plaintiffs that Defendants had successfully consummated numerous similarly-structured transactions, resulting in the counterparty to Defendants receiving significant promised funding.

19.     Upon information and belief, Defendants, in fact, had solicited dozens of similarly-structured transactions, but had never consummated even a single one, and to date have failed to fund any similar transaction.

20.     Mr. Rinde was aware of the falsity of the representation that he had successfully consummated similar transactions at the time he made the representation to each of the Plaintiffs over the course of almost five (5) years.[2]

21.     Had Plaintiffs known that Mr. Rinde's representations were false, and that he had taken escrow funds from other investors and failed to fund their transactions, they obviously never would have entered into the Escrow Agreements with Defendants.

22.     Each of the Plaintiffs executed an Escrow Agreement, whereby Defendants and a lessor agreed to procure a lease of a bank instrument ("BI") for the benefit of each Plaintiff in exchange for a fee of 11% of the face value of the BI. Each Plaintiff executed their respective Escrow Agreement with Defendants in reliance on the provisions therein and Defendants' representations.

---

[2] The first Plaintiff, NAVCAN/Cascade, entered into its Escrow Agreement with Defendants on October 29, 2015. Despite being fully aware that NAVCAN/Cascade had never received the funding it was promised as a result of its escrow payment to Defendants, Defendants continued to market the same transaction to each of the Plaintiffs, until the date Plaintiff Silverstein entered into an Escrow Agreement over four (4) years later on October 22, 2019.

23.     Each Escrow Agreement provided that each Plaintiff would make a partial, initial payment of four percent (4%) of the face value of the BI, into an escrow account under the control of Defendants.

24.     Each Escrow Agreement provided that Defendants were the designated Escrow Agent for the Escrow Payment, and agreed to receive, hold, and release such Payment in accordance with the terms of the Escrow Agreement. Upon presentation of a confirmation from the lessor that the BIs were delivered to each Plaintiff, Defendants were required to release the Escrow Payments.

25.     Additionally, the Escrow Agreement provided that should the lessor fail to deliver the BIs to each Plaintiff within two (2) international banking days of executing the Escrow Agreements, Defendants would return the Escrow Payments to each Plaintiff upon each Plaintiff's written notice of this failure.

26.     Essentially, the Escrow Agreements detailed transactions in which each respective Plaintiff would obtain a loan through Defendants and a lessor, in exchange for a fee, including the initial Escrow Payment deposited with Defendants.

27.     Defendants failed to secure funding for each Plaintiff's promised loan contemplated in each Escrow Agreement within two (2) international banking days of executing the Escrow Agreements, or thereafter.

28.     Defendants failed to secure the promised loan for any of the Plaintiffs, and furthermore, failed to return any of the Plaintiff's Escrow Payments pursuant to the terms of the Escrow Agreements.

29.     Upon information and belief, upon their receipt of Plaintiffs' respective escrow funds, Defendants almost immediately converted the escrow funds for their own benefit.[3]

**A.     The Plaintiffs' Escrow Agreements**

**a.    NAVCAN.DC, Inc. (previously known as Cascade Divide Data Centers, Inc.) (Plaintiff A)**

30.     On October 29, 2015, Plaintiff A entered into an Escrow Agreement with Defendants Rinde and CKR Law, whereby Straightline Capital, L.L.C. ("Straightline" or the "Lessor") agreed to procure a lease of a bank instrument ("BI") for the benefit of Plaintiff in exchange for a fee of 11% of the face value of the BI. *See Exhibit 3.A, NAVCAN/Cascade Escrow Agreement.*

31.     The Escrow Agreement provided that Plaintiff A would make a partial, initial payment of six hundred thousand dollars ($600,000) (the "Escrow Payment"), three percent (3%) of the face value of the BI, into an escrow account.

32.     Pursuant to the Escrow Agreement, Plaintiff A made the six hundred thousand dollar ($600,000) Escrow Payment to Defendants.

33.     However, Defendants never funded the loan promised to Plaintiff A pursuant to the Escrow Agreement.

34.     Despite Plaintiff A's repeated demands that the Escrow Payment be returned to Plaintiff A, Defendants refused to return the Escrow Payment.

---

[3] In a separate arbitration proceeding between Defendants and another non-party investor, that non-party investor stated in a post-hearing brief that "It is also undisputed that almost one-half of the total Escrow Payment (some $646,000) was, within three days after receipt by CKR, paid by CKR and Rinde to themselves, a fact which had not been disclosed[.]" *See Exhibit 5, Post-Hearing Brief at Pages 2-3.* In the course of the AAA arbitration proceeding between the Parties herein, contrary to the Panel's Order, Defendants refused to produce any documents, including but not limited to CKR's escrow account statements, demonstrating what happened to Plaintiff's escrow funds. Plaintiffs would posit that the only conclusion this Court can reach is that Defendants similarly converted Plaintiff's escrow funds.

### b. DACH Holdings, LLC (Plaintiff B)

35.     On March 23, 2019, Plaintiff B entered into an Escrow Agreement with Defendants Rinde and CKR Law, whereby Straightline agreed to procure a lease of a bank instrument ("BI") for the benefit of Plaintiff B in exchange for a fee of 11% of the face value of the BI. *See Exhibit 3.B, DACH Escrow Agreement.*

36.     The Escrow Agreement provided that Plaintiff B would make a partial, initial payment of four hundred thousand dollars ($400,000) (the "Escrow Payment"), four percent (4%) of the face value of the BI, into an escrow account.

37.     Pursuant to the Escrow Agreement, Plaintiff B made the four hundred thousand dollar ($400,000) Escrow Payment to Defendants.

38.     However, Defendants never funded the loan promised to Plaintiff B pursuant to the Escrow Agreement.

39.     Despite Plaintiff B's repeated demands that the Escrow Payment be returned to Plaintiff B, Defendants refused to return the Escrow Payment.

### c. Silverstein Realty Group, Inc. (Plaintiff C)

40.     On October 22, 2019, Plaintiff C entered into an Escrow Agreement with Defendants Rinde and CKR Law, whereby "M-Corp" (the "Lessor") agreed to procure a lease of a bank instrument ("BI") for the benefit of Plaintiff C in exchange for a fee of 11% of the face value of the BI. *See Exhibit 3.C, Silverstein Escrow Agreement.*

41.     The Escrow Agreement provided that Plaintiff C would make a partial, initial payment of four hundred thousand dollars ($400,000) (the "Escrow Payment"), four percent (4%) of the face value of the BI, into an escrow account.

42.     Pursuant to the Escrow Agreement, Plaintiff C made the four hundred thousand dollar ($400,000) Escrow Payment to Defendants.

43.     However, Defendants never funded the loan promised to Plaintiff C pursuant to the Escrow Agreement.

44.     Despite Plaintiff C's repeated demands that the Escrow Payment be returned to Plaintiff B, Defendants refused to return the Escrow Payment.

45.     It is undeniable that Defendants knew the transaction to be fraudulent at the time they solicited Plaintiff C to enter into the transaction.

46.     In fact, Defendants had pre-emptively initiated an arbitration proceeding against another investor, with whom Defendants had entered into an identical transaction and whom had also never received funding nor the return of their escrow payment, seeking damages from the investor and a declaratory judgment that Defendants had not breached their escrow agreement with that investor, on March 12, 2019 – seven months prior to Defendants' fraudulent inducement of Plaintiff C into an identical transaction. *See Exhibit 6, JAMS Arbitration Award.*

47.     In that arbitration proceeding, the investor countersued Defendants and eventually obtained an Award[4] in the amount of $1,360,000.00 (the amount of their escrow payment) plus interest for Defendants' fraud. Defendants' frivolous claims in that matter were denied. *See Exhibit 6, JAMS Arbitration Award.*

48.     Defendants never disclosed the existence of this litigation to Plaintiff C when soliciting Plaintiff C to enter into an identical escrow transaction.

---

[4] Pursuant to a Panel Order, Defendants were under a continuing obligation to produce this Award to Plaintiffs in their arbitration proceeding when it was rendered – first as a "Partial Final Award" on December 19, 2022 and then as a Final Award on January 12, 2023 - at least up until the termination of the proceeding on January 14, 2023. Defendants failed to produce the document to Plaintiffs, who obtained it through their own efforts. Defendants' bad-faith failure to produce documents and disobedience of Panel Orders was a consistent trend throughout the arbitration proceeding between the Parties, as will be detailed below.

49.     Plaintiff C additionally retained Defendants to provide legal services in connection with the above-described transaction on July 1, 2019.

50.     Plaintiff C made a retainer payment of twenty five thousand dollars ($25,000.00) to Defendants.

51.     Upon information and belief, Defendants provided no legal services to Plaintiff C.

52.     If Defendants did provide any legal services to Plaintiff C, such services were performed in a negligent manner, and did not result in the successful consummation of the Escrow transaction, a result under the exclusive control of Defendants, despite Plaintiff C fulfilling all of its obligations under the Escrow Agreement.

53.     Despite Plaintiff C's repeated demands that the retainer payment be returned to Plaintiff C, Defendants refused to return the retainer payment.

### d.  Silver Springs Development, Inc. (Plaintiff D)

54.     On February 22, 2018, Plaintiff D entered into an Escrow Agreement with Defendants Rinde and CKR Law, whereby Straightline agreed to procure a lease of a bank instrument ("BI") for the benefit of Plaintiff D in exchange for a fee of 11% of the face value of the BI. *See Exhibit 3.D, Silver Springs Escrow Agreement.*[5]

55.     The Escrow Agreement provided that Plaintiff D would make a partial, initial payment of one million dollars ($1,000,000) (the "Escrow Payment"), four percent (4%) of the face value of the BI, into an escrow account.

56.     Pursuant to the Escrow Agreement, Plaintiff D made the one million dollar ($1,000,000) Escrow Payment to Defendant.

---

[5] The Silver Springs Escrow Agreement was initially executed by non-party Cordella Developments Corp. ("Cordella"). Cordella later assigned any rights, interests, and/or claims it may have had under the Escrow Agreement to Plaintiff D. *See Exhibit 4, Cordella Assignment.*

57.     However, Defendants never funded the loan promised to Plaintiff D pursuant to the Escrow Agreement.

58.     Despite Plaintiff D's repeated demands that the Escrow Payment be returned to Plaintiff D, Defendants refused to return the Escrow Payment.

### e.  GGH, Inc. (Plaintiff E)

59.     On June 5, 2018, Plaintiff E entered into an Escrow Agreement with Defendants Rinde and CKR Law, whereby Straightline agreed to procure a lease of a bank instrument ("BI") for the benefit of Plaintiff E in exchange for a fee of 11% of the face value of the BI. *See Exhibit 3.E, GGH Escrow Agreement.*

60.     The Escrow Agreement provided that Plaintiff E would make a partial, initial payment of four hundred fifty thousand dollars ($450,000) (the "Escrow Payment"), four percent (4%) of the face value of the BI, into an escrow account.

61.     Pursuant to the Escrow Agreement, Plaintiff E made the four hundred fifty thousand dollars ($450,000) Escrow Payment to Defendant.

62.     However, Defendants never funded the loan promised to Plaintiff E pursuant to the Escrow Agreement.

63.     Despite Plaintiff E's repeated demands that the Escrow Payment be returned to Plaintiff E, Defendants refused to return the Escrow Payment.

### f.  Residencial de Chihuahua 2001, S.A. de C.V. (Plaintiff F)

64.     On April 25, 2017, Plaintiff F entered into an Escrow Agreement with Defendants Rinde and CKR Law, whereby Straightline agreed to procure a lease of a bank instrument ("BI") for the benefit of Plaintiff F in exchange for a fee of 11% of the face value of the BI. *See Exhibit 3.F, Residencial Escrow Agreement.*

65.    The Escrow Agreement provided that Plaintiff F would make a partial, initial payment of one million fifty thousand dollars ($1,050,000) (the "Escrow Payment"), three percent (3%) of the face value of the BI, into an escrow account.

66.    Pursuant to the Escrow Agreement, Plaintiff F made the one million fifty thousand dollars ($1,050,000) Escrow Payment to Defendant.

67.    However, Defendants never funded the loan promised to Plaintiff F pursuant to the Escrow Agreement.

68.    Despite Plaintiff F's repeated demands that the Escrow Payment be returned to Plaintiff F, Defendants refused to return the Escrow Payment.

**B.    Facts Common to All Plaintiffs**

69.    Defendants made the same false representation that they had successfully consummated numerous similarly-structured transactions with numerous prior investors to each Plaintiff, prior to each Plaintiff's agreement to invest escrow funds with Defendants.

70.    Each Plaintiff entered into a virtually identical Escrow Agreement with Defendants and made an escrow payment to Defendants.

71.    Each Plaintiff notified Defendants that they had not received the promised funds.

72.    Each of the Plaintiffs repeatedly complained to Mr. Rinde over the course of several years of the failed transaction, and Mr. Rinde repeatedly informed each of the Claimants of various steps he was allegedly taking to ensure that their promised loans were funded.

73.    Mr. Rinde represented to the Claimants that he was taking an active role in securing their funding, including allegedly communicating with various banks and regulators, foreign and domestic, and even traveling to foreign jurisdictions where their funds were allegedly "held up." Mr. Rinde was the only person Claimants dealt with in this regard.

11

74.     Mr. Rinde represented repeatedly to Claimants that their promised funds were held in certain accounts but that the transfer of such funds was being held up by the Federal Reserve among other entities, and even provided fraudulent account statements showing large balances to certain of the Claimants.

75.     All of the above representations made by Mr. Rinde to Plaintiffs were false and made with the purpose of continuously concealing the fraudulent nature of the transactions Mr. Rinde induced Plaintiffs to enter into.

76.     To date, Defendants have failed to fund each Plaintiff's promised loan.

77.     To date, Defendants have refused to return the Escrow Payments to each Plaintiff, despite each Plaintiff's repeated demands that Defendants return their funds.

78.     Defendants are thus in breach of their Escrow Agreements with each Plaintiff.

79.     Plaintiff A suffered not less than six hundred thousand dollars ($600,000) in damages as a result of Defendants' illegal conduct, Plaintiff B suffered not less than four hundred thousand dollars ($400,000) in damages as a result of Defendants' illegal conduct, Plaintiff C suffered not less than four hundred thousand dollars ($400,000) in damages as a result of Defendants' illegal conduct, Plaintiff D suffered not less than one million dollars ($1,000,000) in damages as a result of Defendants' illegal conduct, Plaintiff E suffered not less than four hundred fifty thousand dollars ($450,000) in damages as a result of Defendants' illegal conduct, and Plaintiff F suffered not less than one million fifty thousand dollars ($1,050,000) in damages as a result of Defendants' illegal conduct.

## C.    The AAA Arbitration

80.    Pursuant to the Parties' Escrow Agreements, Plaintiff NAVCAN/Cascade initially attempted to resolve this dispute via arbitration by filing a Statement of Claim at the American Arbitration Association (the "AAA") on October 29, 2021.

81.    On January 20, 2022, Plaintiffs filed a First Amended Statement of Claim, adding Plaintiffs DACH, Silverstein, Silver Springs, and GGH as additional claimants in the arbitration.

82.    On February 22, 2022, Plaintiffs filed a Second Amended Statement of Claim, adding Plaintiff Residencial as a sixth Claimant.

83.    On March 10, 2022, Defendants filed an Answer to Plaintiffs' Second Amended Statement of Claim, and asserted a variety of frivolous counterclaims and third-party claims.[6]

84.    Plaintiffs timely paid the initial filing fee and proceed fee required by the AAA, in the total amount of $15,075.00.

85.    On or about April 13, 2022, a Panel of three arbitrators was assigned to the case by the AAA, and the AAA issued an invoice to the Parties for the arbitrators' initial fee deposit in the amount of $8,300.00 for each side.

86.    Plaintiffs promptly paid their share of the arbitrators' initial fee deposit.

87.    On or about May 13, 2022, the Parties participated in an initial pre-hearing conference ("IPHC") with the Panel, and the Panel issued a scheduling Order.

88.    Soon after the IPHC, Plaintiffs learned that Defendants had failed to pay their initial arbitrator deposit.

89.    On or about May 27, 2022, the AAA issued an additional invoice to the parties, in the amount of $44,012.50 for each side, for additional fees incurred by the arbitrators.

---

[6] Among these claims was a laughably absurd claim by Defendants that Plaintiffs fraudulently induced Defendants into accepting and converting Plaintiffs' own escrow funds. Defendants provided no explanation of what damages they possibly could have incurred by this alleged fraudulent inducement into their theft of Plaintiffs' money.

90. Plaintiffs again timely paid the May 27, 2022 invoice, and Defendants again failed to timely pay the invoice.

91. As a result of this non-payment, the Panel suspended its scheduling Order, including previously scheduled final hearing dates.

92. Defendants eventually paid the initial arbitrator deposit and May 27, 2022 invoice, and the Panel held another pre-hearing conference on or about September 6, 2022, and issued another scheduling Order.

93. After this second pre-hearing conference, Defendants continued to obstruct and delay the arbitration proceeding, refusing to cooperate in discovery and repeatedly disobeying Panel Orders to produce documents and information.

94. Plaintiffs were forced to make numerous applications to the Panel to attempt to compel Defendants to comply with their discovery obligations, generating significant additional arbitrator fees.

95. On or about September 22, 2022, the AAA issued another invoice to the Parties for the arbitrators' additional incurred fees in the amount of $31,562.50 for each side.

96. Plaintiffs promptly paid their share of the amount due, bringing the total arbitration fees paid by Plaintiffs to $98,950.00.

97. On or about October 31, 2022, the Chairman of the Panel held a discovery conference to address the issues raised by Plaintiffs, during which Plaintiffs again raised the numerous instances of misconduct by Defendants. During this conference, Plaintiffs learned that Defendants had again failed to pay their requisite share of the September 22, 2022 invoice. Defendants represented that they would pay their outstanding amount due in short order.

98.    Following the October 31, 2022 discovery conference, Plaintiffs sent a Letter to the Panel detailing Defendants repeated and continuous misconduct. *See Exhibit 7, Plaintiffs' October 31, 2022 Letter.*

99.    In response to Plaintiffs' October 31, 2022 Letter, on November 2, 2022 the Panel ordered the Parties to submit letter briefs as to what sanctions the Panel should impose against Defendants and/or their Counsel.

100.    Plaintiffs submitted their letter brief in support of sanctions against Defendants and their Counsel on November 9, 2022. *See Exhibit 8, Plaintiffs' November 9, 2022 Letter Brief.*

101.    On or about November 15, 2022, administrators at the AAA held a call with the Parties to discuss the overdue invoice. During the conference, Defendants again represented that they would satisfy the overdue invoice in short order.

102.    However, Defendants continued to withhold payment, and on November 18, 2022 the Panel issued an Order[7] suspending the arbitration because "full deposits were not received from [Defendants]." The Order set a deadline of December 16, 2022 for Defendants to meet their payment obligations. *See Exhibit 9, Suspension Order.*

103.    On December 17, 2022, one day after the deadline for payment imposed by the Panel, Defendants sent a letter to the Panel requesting an extension to meet their payment obligations, while providing no explanation for having missed the Panel's deadline. *See Exhibit 10, Defendants' December 17, 2022 Letter.[8]*

104.    On December 20, 2022, Plaintiffs responded to Defendants' December 17, 2022 Letter, stating that Plaintiffs could not afford to pay Defendants' overdue fees and requesting that

---

[7] The Order was erroneously dated December 17, 2022. The Parties received the Order from the AAA on November 18, 2022.

[8] Defendants dated their Letter December 16, 2022, in an attempt to appear as if they had sent it prior to the passing of the deadline for payment, but did not send the letter until the morning of December 17, 2022, a Saturday.

the Panel decline to credit Defendants' continuing misrepresentations as to payment. *See Exhibit 11, Plaintiffs' December 20, 2022 Letter.*

105.    Plaintiffs further requested that the Panel rule on Plaintiffs' request for sanctions against Defendants.

106.    On January 13, 2023, the Chairman of the Panel issued an Order terminating the arbitration, stating that "despite assurances from [Defendants] that deposits would be made, required [Defendants'} deposits have not been made. Therefore, in accordance with Rule R-57, this arbitration is hereby terminated." The Panel declined to rule on Plaintiffs' request for sanctions prior to terminating the arbitration. *See Exhibit 2, Termination Order.*

107.    Subsequent to the termination, Plaintiffs requested that the AAA provide an estimate of the cost of continuing the arbitration to an Award should Plaintiffs pay Defendants' outstanding amount due.

108.    The AAA advised Plaintiffs that, with the bold assumption that Defendants would be cooperative going forward and no further discovery issues would arise, the total cost to proceed to an Award would be not less than $216,028.75.[9]

109.    Plaintiffs, who had collectively been defrauded of approximately $4,000,000.00 by Defendants, could not afford to pay this amount to continue with the arbitration.

## COUNTS ALLEGED

### COUNT ONE:
### BREACH OF CONTRACT AS TO THE ESCROW PAYMENTS

110.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 109, as if fully set forth herein.

---

[9] The AAA advised that if Respondents continued to behave as they had throughout the proceeding, rather than cooperating, the total fees would be much greater than $216,028.75.

111.    The elements of a breach of contract claim in New York are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach.[10]

112.    Each of the Plaintiffs entered into an Escrow Agreement with Defendants, under which Plaintiffs promised to make initial Escrow Payments as described above, to be held in escrow by Defendants in partial consideration for Defendants' procurement of a BI for Plaintiffs' benefit.

113.    Plaintiffs have performed all conditions precedent to bringing this action for breach of contract.

114.    Defendants have breached their contractual relationship with Plaintiffs by failing to return the Escrow Payments to each Plaintiff, despite Plaintiffs' having provided notice of Defendants' failure to procure the BI.

115.    As a result of Defendants' breach of contract, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs

---

[10] See RCN Telecom Services, Inc. v. 202 Centre Street Realty LLC, 156 Fed.Appx. 349, 350--51, 2005 (C.A.2 (N.Y.), 2005).

have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' breach of contract.

## COUNT TWO:
## FRAUD AND FRAUDULENT CONCEALMENT

116.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 115 as if fully set forth herein.

117.    The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.[11]

118.    "Where a cause of action or defense is based upon misrepresentation, fraud, mistake, willful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail."[12]

119.    Defendants knowingly made material misrepresentations of fact to Plaintiffs when Defendants represented to Plaintiffs that Defendants would hold the Plaintiffs' respective Escrow Payment in trust for Plaintiffs, and return such Escrow Payment to Plaintiff upon Plaintiff's notification to Defendants that Defendants failed to procure a BI for Plaintiff's benefit within two (2) international bank days of the Escrow Agreement's execution.

120.    Defendants in fact intended to convert Plaintiffs' escrow payments for their own benefit and upon receipt of Plaintiffs' escrow payments, Defendants did convert the funds.

121.    Defendants further knowingly made a material misrepresentation of fact to Plaintiffs when Defendants represented to each of the Plaintiffs that Defendants had previously

---

[11] Eprycleia Partners, LP v. Seward & Kissel, LLP, 910 N.E.2d 976, 979, 883 N.Y.S.2d 147, 150, 12 N.Y.3d 553, 559 [NY, 2009].

[12] N.Y. CPLR § 3016 (McKinney 2018) ("Particularity in specific actions").

successfully executed numerous similarly-structured transactions, and that Defendants would successfully fund Plaintiffs' respective promised loans.

122. Defendants intended to induce Plaintiffs into executing their respective Escrow Agreements and making their respective Escrow Payments to Defendants by making these representations.

123. Plaintiffs each did make the Escrow Payments to Defendants in reliance on Defendants' representations.

124. After Plaintiffs made the Escrow Payments to Defendants, Defendants continued to make misrepresentations to Plaintiffs.

125. Defendants repeatedly represented to each of the Claimants that Mr. Rinde was taking various steps, including communicating with banks and regulators, and even traveling to foreign jurisdictions, to ensure the funding of their promised loans.

126. Mr. Rinde repeatedly represented to Claimants that their promised funds were held in certain accounts and that various regulators and banks were holding up their funding.

127. Defendants' purpose in making these misrepresentations to Claimants was to conceal the fraudulent nature of the transactions Defendants had induced Claimants to enter into.

128. As a result of Defendants' fraud and fraudulent concealment, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in

an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' fraud.

**COUNT THREE:**
**MISREPRESENTATION AND OMISSION**

129.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 124 as if fully set forth herein.

130.     A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'[13]

131.     Defendants had a duty to impart correct information to Plaintiffs regarding the terms of the Escrow Agreements executed by the Parties, by which Plaintiffs made Escrow Payments as detailed above in consideration for Defendants' procurement of a loan for Plaintiffs' benefit.

132.     Defendants knowingly or negligently made a material misrepresentation of fact to Plaintiffs when Defendants represented to Plaintiffs that Defendants would either fund Plaintiffs' promised loans or return Plaintiffs' Escrow Payment upon Defendants' failure to fund such loans.

133.     Defendants further knowingly or negligently made a material misrepresentation of fact to Plaintiff when Defendants represented to Plaintiff that Defendants had previously

---

[13] JA.O. Acquisition Corp . Stavitsky, 863 N.E.2d 585, 587, 831 N.Y.S.2d 364, 366, 8 N.Y.3d 144, 148 [NY 2007].

successfully executed numerous similarly-structured transactions, and that Defendants would successfully fund Plaintiffs' loan.

134.    Plaintiffs reasonably relied on this information in making their respective decisions to enter into their respective Escrow Agreements with Defendants.

135.    As a result of Defendants' misrepresentations and omissions, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' misrepresentations and omissions.

## COUNT FOUR:
## BREACH OF THE DUTY OF GOOD FAITH & FAIR DEALING

136.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 131 as if fully set forth herein.

137.    "For a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the

defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff."[14]

138.    As a result of Plaintiffs' respective Escrow Agreement with Defendants, Plaintiffs expected Defendants to act in accordance with the terms of the Escrow Agreements and either fund Plaintiffs' promised loans or return the Escrow Payments to Plaintiffs upon Defendants' failure to do so and Plaintiff's written notice thereof to Defendants.

139.    Defendants withheld a benefit from Plaintiffs when Defendants did not return Plaintiffs' respective Escrow Payments to Plaintiffs upon their failure to fund Plaintiffs' promised loans and Plaintiffs' written notice thereof to Defendants.

140.    As a result of Defendants' breach of their duties of good faith and fair dealing, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' breach of the duty of good faith and fair dealing.

---

[14] Aventine Inv. Management- Inc. v. Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 514 (2d Dep't, 1999).

## COUNT SIX:
## BREACH OF FIDUCIARY DUTY

141.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 136 as if fully set forth herein.

142.    In order to establish a breach of fiduciary duty, "a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct."[15]

143.    A fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship."[16]

144.    Defendants, as Escrow Agent, owed an affirmative duty of care and loyalty to their escrow beneficiaries.[17]

145.    Defendants also owed an affirmative duty of care and loyalty to Plaintiff Silverstein, as Plaintiff Silverstein's retained counsel in relation to the escrow transaction between Defendants and Plaintiff Silverstein.

146.    Defendants knew or should have known that Plaintiffs had placed their complete trust and confidence in Defendants to provide accurate information in regard to the transaction Defendants solicited Plaintiff to enter into and to properly handle their escrow funds.

147.    Defendants breached their fiduciary duty to Plaintiffs under applicable state and federal securities laws and exchange rules in a reckless, willful, and wanton manner and with

---

[15]     Kurtzman v. Bergstol, 40 A.D.3d 588, 590 (2d Dep't, 2007).
[16]     EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 832 N.E.2d 26 [N.Y. 2011] (citing Restatement [Second] of Torts § 874, Comment a.).
[17]     Baquerizo v Monasterio, 90 AD3d 587 [2d Dept 2011] ("An attorney holding funds in escrow owes a fiduciary duty "to 'anyone with a beneficial interest in the trust'")

total disregard for the legal and fiduciary rights of Plaintiff, by fraudulently inducing Plaintiffs to make escrow payments to Defendants and converting their funds.

148. As a result of Defendants' breach of fiduciary duty, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' breach of fiduciary duty.

## COUNT SEVEN:
## CONVERSION

149. Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 144 as if fully set forth herein.

150. "To maintain a claim for conversion, a plaintiff must show: (1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights."[18]

---

[18] Neely v. Residential Mortg. Solution, LLC, 2015 WL 6438772, at *4 (E.D.N.Y. 2015).

151.     Here, the property subject to conversion is each of Plaintiffs' respective Escrow Payments.

152.     Plaintiffs had ownership and control over the funds comprising each of Plaintiffs' respective Escrow Payments before Defendants' conversion of such funds.

153.     Defendants exercised an unauthorized dominion over each Escrow Payment when Defendants failed to return the Escrow Payments to Plaintiffs, despite Defendants' failure to fund Plaintiffs' promised loans and Plaintiffs' written notice to Defendants thereof.

154.     As a result of Defendants' conversion, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' conversion.

## COUNT SEVEN:
## UNJUST ENRICHMENT

155.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 150 as if fully set forth herein.

156.     An unjust enrichment claim requires that plaintiff shows "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."[19]

157.     The essence of an unjust enrichment claim is "an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it."[20]

158.     Defendants were enriched by retaining Plaintiffs' respective Escrow Payments after failing to fund the loans promised to Plaintiffs.

159.     Defendants were enriched at Plaintiffs' expense because as a result Defendants' failure to return the Escrow Payments to Plaintiffs, Plaintiffs were deprived of the funds constituting their Escrow Payments.

160.     It is against equity and good conscience to permit Defendants to retain the Escrow Payments because Defendants had an obligation to return the Escrow Payments to Plaintiffs upon Defendants' failure to fund the loans promised to Plaintiffs.

161.     As a result of Defendants' unjust enrichment, Plaintiff A has been damaged in an amount not yet fully ascertained, but believed to be in excess of six hundred thousand dollars ($600,000), Plaintiff B has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars ($400,000), Plaintiff C has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred thousand dollars

---

[19] <u>Mandarin Trading v. Wildenstein</u>, 16 N.Y.3d 173 (N.Y. 2011), at 182.

[20] <u>Saunders v. Klein</u>, 55 A.D.2d 887 (1st Dep't. 1977), at 888.

($400,000), Plaintiff D has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million dollars ($1,000,000), Plaintiff E has been damaged in an amount not yet fully ascertained, but believed to be in excess of four hundred fifty thousand dollars ($450,000), and Plaintiff F has been damaged in an amount not yet fully ascertained, but believed to be in excess of one million fifty thousand dollars ($1,050,000). In total, Plaintiffs have been damaged in an amount not less than three million nine hundred thousand dollars ($3,900,000.00) as a result of Defendants' unjust enrichment.

## COUNT EIGHT:
## BREACH OF THE RETAINER AGREEMENT AS TO PLAINTIFF SILVERSTEIN REALTY GROUP, INC.

162.     Plaintiff Silverstein re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 157, as if fully set forth herein.

163.     The elements of a breach of contract claim in New York are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach.[21]

164.     Plaintiff Silverstein entered into a Retainer Agreement with Defendants, by which Defendants promised to provide legal services in connection with the loan transaction between Plaintiff Silverstein and Defendants in exchange for a retainer payment of $25,000.00.

165.     Plaintiff Silverstein has performed all conditions precedent to bringing this action for breach of contract.

166.     Defendants have breached their contractual relationship with Plaintiff Silverstein by failing to provide any legal services to Plaintiff Silverstein in connection to the loan

---

[21] See RCN Telecom Services, Inc. v. 202 Centre Street Realty LLC, 156 Fed.Appx. 349, 350--51, 2005 (C.A.2 (N.Y.), 2005).

transaction between Plaintiff Silverstein and Defendants and subsequently refusing to return the retainer payment to Plaintiff Silverstein despite his demand that the retainer payment be returned.

167.    Any legal services that may have been performed by Defendants pursuant to the retainer agreement were performed negligently, as evidenced by Defendants' failure to secure the promised loan or return Plaintiff Silverstein's escrow payment, despite such outcomes having been in Defendants' exclusive control.

168.    As a result of Defendants' breach of contract, Plaintiff Silverstein has been damaged in an amount not yet fully ascertained but believed to be in excess of twenty-five thousand dollars ($25,000.00).

## COUNT NINE:
## BREACH OF CONTRACT AS TO THE ARBITRATION AGREEMENT

169.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 164 as if fully set forth herein.

170.    The elements of a breach of contract claim in New York are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach.[22]

171.    Each of the Plaintiffs entered into an Escrow Agreement with Defendants, under which the Parties agreed to arbitrate any dispute arising from the Escrow Agreement.

172.    Plaintiffs have performed all conditions precedent to bringing this action for breach of contract.

---

[22] See RCN Telecom Services, Inc. v. 202 Centre Street Realty LLC, 156 Fed.Appx. 349, 350--51, 2005 (C.A.2 (N.Y.), 2005).

173.     Defendants have breached their contractual relationship with Plaintiffs by failing to arbitrate the instant dispute in good faith, and intentionally derailing the AAA arbitration proceeding by refusing to pay their requisite share of arbitrators' fees.

174.     Defendants' consistent pattern of misconduct throughout the AAA arbitration proceeding generated significant arbitrators' fees for Plaintiffs that should have been unnecessary, and delayed resolution of the instant dispute by years.

175.     As a result of Defendants' breach of contract, Plaintiffs have been damaged in an amount not yet fully ascertained, but believed to be in excess of ninety eight thousand nine hundred fifty dollars ($98,950.00).

## COMPENSATORY DAMAGES, INTEREST, PUNITIVE DAMAGES, AND ATTORNEYS' FEES

176.     For all of the foregoing reasons, this Court should award compensatory damages in an amount to be determined at arbitration but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred twenty five thousand dollars ($425,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, the Arbitrator should award compensatory damages to Plaintiffs in an amount to be determined at trial but not less than three million nine hundred twenty five thousand dollars ($3,925,000.00).

177.     The Court should additionally award Plaintiffs compensatory damages in the amount of ninety eight thousand nine hundred fifty dollars ($98,950.00) for their losses incurred as a result of Defendants' misconduct in the AAA arbitration proceeding.

178.   The Court should additionally award each Plaintiff interest accrued at the New York State statutory rate of nine percent (9%) per annum from the date each respective Escrow Agreement was breached by Defendants until the date of payment pursuant to CPLR § 5004.[23]

179.   The Court should additionally award each Plaintiff its respective attorneys' fees pursuant to Section 5(c) of each respective Escrow Agreement, which provides the Court authority to award attorneys' fees in connection with disputes arising from the Escrow Agreements. *See Exhibits 3.A-F, at Section 5(c).*

180.   The Court should additionally award each punitive damages to each Plaintiff.

181.   Under New York law, punitive damages are "appropriate in cases involving gross, wanton, or willful fraud or other morally culpable conduct."[24]

182.   Here, Defendants willfully defrauded each of the Plaintiffs employing an identical scheme and making use of identical Escrow Agreements from 2015 through 2019 as detailed above.

183.   Defendants continued to defraud new investors even after Defendants were unable to consummate the earlier loan transactions, and refused to return the Escrow Payments they obtained through fraud to any of the Plaintiffs.

184.   Defendants further intentionally obstructed, delayed, and eventually caused to be terminated the AAA arbitration proceeding in which Plaintiffs initially attempted in good faith to resolve this dispute.

185.   Defendants' conduct towards Plaintiffs rises to the level of morally culpable conduct that punitive damages are intended to deter.

---

[23] "Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute." *CPLR § 5004.*

[24] Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC., 376 F. Supp. 2d 385, 412 (S.D.N.Y. 2005).

186.     As a result of Defendants' willful fraud and subsequent misconduct in the AAA arbitration proceeding, Plaintiffs request punitive damages be awarded in an amount not less than three times the compensatory damages awarded to each respective Plaintiff, along with attorney's fees and interest.

**WHEREFORE,** Plaintiff requests the following relief:

a.  On the First Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial, but not less than three million nine hundred thousand dollars ($3,900,000.00);

b.  On the Second Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial, but not less than three million nine hundred thousand dollars ($3,900,000.00);

c.  On the Third Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A,

four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial, but not less than three million nine hundred thousand dollars ($3,900,000.00);

d. On the Fourth Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial but not less than three million nine hundred thousand dollars ($3,900,000.00);

e. On the Fifth Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial, but not less than three million nine hundred thousand dollars ($3,900,000.00);

f. On the Sixth Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial, but not less than three million nine hundred thousand dollars ($3,900,000.00);

g. On the Seventh Count, awarding compensatory damages in an amount to be determined at trial, but not less than six hundred thousand dollars ($600,000.00) to Plaintiff A, four hundred thousand dollars ($400,000.00) to Plaintiff B, four hundred thousand dollars ($400,000.00) to Plaintiff C, one million dollars ($1,000,000.00) to Plaintiff D, four hundred fifty thousand dollars ($450,000.00) to Plaintiff E, and one million fifty thousand dollars ($1,050,000) to Plaintiff F. In total, awarding compensatory damages in an amount to be determined at trial, but not less than three million nine hundred thousand dollars ($3,900,000.00);

h. On the Eighth Count, awarding compensatory damages to Plaintiff C in an amount to be determined at trial, but not less than twenty five thousand dollars ($25,000.00);

i. On the Ninth Count, awarding compensatory damages to Plaintiffs in an amount to be determined at trial, but not less than ninety eight thousand nine hundred fifty dollars ($98,950.00)

j. As to all Counts, awarding punitive damages in an amount not less than three times compensatory damages to each Plaintiff;

k.  As to all Counts, awarding each Plaintiff their respective reasonable attorneys' fees and costs;

l.  As to all Counts, awarding interest accruing from the date of the breach;

m.  As to all Counts, awarding Plaintiffs' compensatory damages totaling an amount in excess of four million twenty three thousand nine hundred fifty dollars ($4,023,950.00) plus interest, costs, reasonable attorneys' fees and punitive damages;

n.  As to all Counts, awarding such other and further relief as the Court deems just and fair.

Dated: New York, New York
March 16, 2023

Respectfully Submitted,

Kevin P. Conway, Esq. (6946)
Conway & Conway
*Attorneys for Plaintiffs*
99 Park Avenue, 6th Floor
New York, NY 10016
(212) 938-1080
kpc@conway-conway.com

Exhibit 2

# **ESCROW AGREEMENT**

This Escrow Agreement (the "Agreement"), dated as of September 9th, 2019 is by and among, THE SUMMERS GROUP (the "Company") with an address at 1171 Meadowcreek Circle, Saint Helena, CA 94574 a California corporation, represented by William Summers and Ault Capital, LLC ("A-Cap"), a Florida Limited Liability Company, represented by David Ault, located at 23150 Fashion Drive, Suite 231, Estero, Florida 33928 (A-Cap and Company is herein referred to as the "Escrow Parties"), and CKR Law, LLP (the "Escrow Agent"), a United States law firm with its principal place of business at 1330 Avenue of the Americas New York, New York 10019.

**WHEREAS**, the Company is ready, willing and able to lease a Bank Instrument ("BI") pursuant to an Investment Agreement ("IA"), to be entered into between The Summers Group and Ault Capital together with the execution of this Agreement and the conditions precedent to the issuance thereof;

**WHEREAS**, A-Cap has agreed to procure the BI as detailed in the Memorandum of Understanding dated September _9th_, 2019 entered into by and between the Company and A-Cap (the "MOU").

**WHEREAS**, pursuant to the MOU the Company agreed to place in escrow the amount of **$880,000** US Dollars to be used by A-Cap to obtain the BI and for related costs and expenses (the "Escrow Payment").

**WHEREAS**, A-Cap shall use the BI to fund a term loan to the Company ("Loan") in the amount of $22,000,000 US Dollars on the terms set forth in the MOU ("Loan Amount");

**WHEREAS,** the Escrow Agent has agreed to receive, hold and release the Escrow Payment in accordance with the terms and conditions of this Agreement; and

**WHEREAS**, included in the Escrow Payment is an administration fee (the "Admin Fee") to cover administration, legal fees, banking fees, and any other fees, costs or expenses in connection with this transaction. For clarification purposes only, the Escrow Agent's Fees, Admin Fees, Costs and Expenses in Section 10 of this Agreement shall be paid by A-Cap and Company shall not be responsible for any payments in addition to the Escrow Funds (as defined below).

**NOW, THEREFORE**, in consideration of the premises and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto hereby agree as follows:

1

Company's Initials:WS          A-Cap's Initials:          Escrow Agent Initials: ⊂ K R

**1.**    **Establishment of Escrow.** On or prior to two (2) business days following the execution date of this Agreement, the Company shall deliver the Escrow Payment, inclusive of the Admin Fee (together, the "Escrow Funds") to the Escrow Agent to the bank coordinates on Annex A. Following receipt of the Escrow Funds, the Escrow Agent shall promptly confirm receipt of the Escrow Funds to the Escrow Parties.

**2.**    **Appointment of Agent.** The Escrow Parties appoint and designate the Escrow Agent as their agent to hold in escrow, and to administer the disposition of, the Escrow Funds in accordance with the terms of this Agreement, and the Escrow Agent accepts such appointment.

**3.**    **Handling of the Escrow Payments.** The Escrow Agent shall hold the Escrow Payment in its IOLA bank account in accordance with its internal policies for the handling of other funds of a similar nature. The Escrow Agent shall be entitled to use the Admin Fee for costs and fees associated with the transaction detailed in the IA and MOU and will be placed in the general operating account and will not be placed in escrow.

**4.**    **Release of the Escrow Funds**.

(a)    The Escrow Agent shall release the Escrow Payment (other than the Admin Fee) to the BI provider pursuant to its instructions within two (2) international banking days of receipt by the Escrow Agent of:

(i)    a copy of the SWIFT MT760 with "Answer Back" from A-Cap's designated bank, confirming the issuance and successful transmission of the BI; and

(ii)    a copy of A-Cap's commitment from a third party to monetize the BI and fund the Loan, which agreement provides committed funding sufficient to pay the first disbursement and subsequent disbursements up to the Loan Amount over a ten-month period.

(b)    Upon notice from Company that A-Cap has failed to deliver the BI by SWIFT MT760 to A-Cap's designated bank within two (2) international banking days of payment of the Escrow Payment, the Escrow Agent shall, if not previously released, return the Escrow Payment to Company within two (2) international banking day of receipt of such notice. An "international banking day" means a day on which banks in New York and London are open for business.

(c)    Upon receipt of written notice from the Company and A-Cap by the Escrow Agent that the IA that the Company and A-Cap executed has been terminated, or the IA proposed terms have expired, the Escrow Agent shall return, if not previously released, the Escrow Payment to the Company, exclusive of any bank charges in connection with the Admin Fee, within two (2) international banking days of receipt of such notice.

(d)    Notwithstanding anything to the contrary in this Agreement, if at any time, the Escrow Agent receives any other instructions signed by each of the Escrow Parties, or their respective successors or assigns, as to the disbursement of the Escrow Payment or any portion

2

Company's Initials: WS          A-Cap's Initials: [signature]     Escrow Agent Initials: C K R

thereof, the Escrow Agent shall disburse the Escrow Payment pursuant to such instructions. The Escrow Agent shall have no obligation to follow any directions set forth in any such instructions unless and until the Escrow Agent is satisfied, in its sole discretion that the persons executing said instructions are authorized to do so.

(e)      The Escrow Agent shall promptly disburse the Admin Fee, in its sole discretion, to pay the fees, costs and expenses payable in connection with this transaction in accordance with the terms hereof.

(f)      The Escrow Agent shall have no obligation to release the Escrow Payment in accordance with clauses (a) – (e) of this Section 4 unless and until the Escrow Agent is satisfied, in its sole discretion, with the written evidence and that the person requesting the payment is authorized to do so.

(g)      Delivery of the Escrow Funds to the Escrow Parties shall be to the bank coordinates set forth in <u>Annex A</u> to this Agreement.

(h)      Notwithstanding anything to the contrary in this Agreement, if the initial disbursement of the Loan is not made within sixty days of release of the Escrow Payment ("Initial Closing Period"), or if all the disbursements under the Loan are not made when due under the terms of the Loan, then A-Cap shall promptly reimburse the Company the full Escrow Payment if the initial advance of the Loan is not made within the Initial Closing Period, or that portion of the Escrow Payment that is equivalent to the pro rata portion of the Loan not extended in accordance with its terms.

**5.      <u>Responsibilities and Liability of Escrow Agent</u>.**

(a)      **<u>Duties Limited.</u>** The Escrow Agent undertakes to perform only such duties as are expressly set forth in this Agreement. The Escrow Agent's duties shall be determined only with reference to this Agreement and applicable laws and it shall have no implied duties. The Escrow Agent shall not be bound by, deemed to have knowledge of, or have any obligation to make inquiry into or consider, any term or provision of any agreement between any of the Escrow Parties and/or any other third parties or as to which the escrow relationship created by this Agreement relates, including without limitation any documents referenced in this Agreement.

(b)      **<u>Limitations on Liability of Escrow Agent</u>.** Except in cases of the Escrow Agent's bad faith, willful misconduct or gross negligence, the Escrow Agent shall be fully protected (i) in acting in reliance upon any certificate, statement, request, notice, advice, instruction, direction, other agreement or instrument or signature reasonably and in good faith believed by the Escrow Agent to be genuine, (ii) in assuming that any person purporting to give the Escrow Agent any of the foregoing in connection with either this Agreement or the Escrow Agent's duties, has been duly authorized to do so, and (iii) in acting or failing to act in good faith on the advice of any counsel retained by the Escrow Agent. The Escrow Agent shall not be

3

liable for any mistake of fact or law or any error of judgment, or for any act or omission, except as a result of its bad faith, willful misconduct or gross negligence. The Escrow Agent shall not be responsible for any loss incurred upon any action taken under circumstances not constituting bad faith, willful misconduct or gross negligence.

Without limiting the generality of the foregoing, it is agreed that except in case of the Escrow Agent's bad faith, willful misconduct or gross negligence, in no event will the Escrow Agent be liable for any lost profits or other indirect, special, incidental or consequential damages which the parties may incur or experience by reason of having entered into or relied on this Agreement or arising out of or in connection with the Escrow Agent's services, even if the Escrow Agent was advised or otherwise made aware of the possibility of such damages; nor shall the Escrow Agent be liable for acts of God, acts of war, breakdowns or malfunctions of machines or computers, interruptions or malfunctions of communications or power supplies, labor difficulties, actions of public authorities, or any other similar cause or catastrophe beyond the Escrow Agent's reasonable control.

In the event that the Escrow Agent shall be uncertain as to its duties or rights under this Agreement, or shall receive any certificate, statement, request, notice, advice, instruction, direction or other agreement or instrument from any other parties with respect to the Escrow Funds which, in the Escrow Agent's reasonable and good faith opinion, is in conflict with any of the provisions of this Agreement, or shall be advised that a dispute has arisen with respect to the Escrow Funds or any part thereof, the Escrow Agent shall be entitled, without liability to any person except in case of the Escrow Agent's bad faith, willful misconduct or gross negligence, to refrain from taking any action other than to keep safely the Escrow Funds until the Escrow Agent shall be directed otherwise in accordance with joint written instructions from the Escrow Parties or an order of a court with jurisdiction over the Escrow Agent. The Escrow Agent shall be under no duty to institute or defend any legal proceedings, although the Escrow Agent may, in his discretion and at the expense of the Escrow Parties as provided in subsections (c) or (d) immediately below, institute or defend such proceedings.

(c)     **Indemnification of Escrow Agent**. Except in case of the Escrow Agent's bad faith, willful misconduct or gross negligence, the Escrow Parties jointly and severally agree to indemnify the Escrow Agent for, and to hold him harmless against, any and all claims, suits, actions, proceedings, investigations, judgments, deficiencies, damages, settlements, liabilities and expenses (including reasonable and documented legal fees and expenses of attorneys chosen by the Escrow Agent) as and when incurred, arising out of or based upon any act, omission, alleged act or alleged omission by the Escrow Agent or any other cause, in any case in connection with the acceptance of, or performance or non-performance by the Escrow Agent of any of the Escrow Agent's duties under this Agreement. Notwithstanding the foregoing, in no event shall the Company's obligations to the Escrow Agent pursuant to this subsection exceed the amount of the Escrow Payment.

(d)     **Authority to Interplead**. The Escrow Parties authorize the Escrow Agent, if the Escrow Agent is threatened with litigation or is sued; to interplead all interested parties in any

4

Company's Initials: WS          A-Cap's Initials: _____          Escrow Agent Initials: C KR

court of competent jurisdiction and to deposit the Escrow Funds, with the clerk of that court. In the event of any dispute under this Agreement, the Escrow Agent shall be entitled to petition a court of competent jurisdiction and shall perform any acts ordered by such court.

**6.     Termination**. This Agreement, except as to the obligations of A-Cap with respect to the provisions of Section 4(h) hereof, and all the obligations of the Escrow Agent under this Agreement shall terminate upon the earliest to occur of the release of the Escrow Funds by the Escrow Agent in accordance with this Agreement or the deposit of the Escrow Funds, by the Escrow Agent in accordance with Section 5(d) hereof.

**7.     Removal of Escrow Agent.** The Escrow Parties shall jointly have the right to terminate the appointment of the Escrow Agent, specifying the date upon which such termination shall take effect. Thereafter, the Escrow Agent shall have no further obligation to the Escrow Parties except to hold the Escrow Funds, as depository and not otherwise. The Escrow Agent shall refrain from taking any action until it shall receive instructions from the Escrow Parties designating the successor escrow agent. Escrow Agent shall deliver the Escrow Funds or any remaining part thereof, to such successor escrow agent in accordance with such instructions and upon receipt of the Escrow Funds or any remaining part thereof, the successor escrow agent shall be bound by all of the provisions of this Agreement.

**8.     Resignation of Escrow Agent**. The Escrow Agent may resign and be discharged from its duties and obligations hereunder at any time by giving no less than ten (10) days' prior written notice of such resignation to the Escrow Parties, specifying the date when such resignation will take effect. Thereafter, the Escrow Agent shall have no further obligation to the Escrow Parties except to hold the Escrow Funds or any remaining part thereof as depository and not otherwise. In the event of such resignation, the Escrow Parties agree that they will jointly appoint a successor escrow agent within ten (10) days of notice of such resignation. The Escrow Agent shall refrain from taking any action until the Escrow Agent shall receive instructions from the Escrow Parties designating the successor escrow agent. The Escrow Agent shall deliver the Escrow Funds, or any remaining part thereof, to such successor escrow agent in accordance with such instructions and upon receipt of the Escrow Funds or any remaining part thereof, the successor escrow agent shall be bound by all of the provisions of this Agreement. However, if at expiration of such ten (10) day period, the Escrow Parties have not designated a successor escrow agent, then the Escrow Agent shall promptly return the Escrow Funds or any remaining part thereof to the Company.

**9.     Survival**. Notwithstanding anything in this Agreement to the contrary, the provisions of Section 5 shall survive any resignation or removal of the Escrow Agent, and any termination of this Agreement.

**10.     Escrow Agent Fees, Costs, and Expenses**. The Escrow Agent shall charge a transaction cost of one half (1/2%) percent of the face value of the BI transaction, which shall be paid by A-Cap, and shall be entitled to immediately pay its expenses which are customary fees, vendors or partners expenses, bank charges, travel expenses, and delivery charges or other out of pocket

expenses incurred in connection with this Agreement. A-Cap, acknowledges its obligation to pay any costs, expenses and other amounts owed to the Escrow Agent pursuant to this Agreement.

**11.     Notices**. All notices under this Agreement to be transmitted to the respective parties, shall be in writing and shall be considered to have been duly given or served when personally delivered to any Company parties, or on the first (1st) business day after the date of deposit with an overnight courier for next day delivery, postage paid, or on the third (3rd) business day after deposit in the domestic or local mail service, certified or registered, return receipt requested, postage prepaid, or on the date of telecopy, fax or similar transmission during normal business hours, as evidenced by mechanical confirmation of such telecopy, fax or similar transmission, addressed in all cases to the parties at his or its address set forth below, or to such other address as such parties may designate, provided that notices will be deemed to have been given to the Escrow Agent on the actual date received:

> If to Company:
>
> > The Summers Group, LLC
> > 1171 Meadowcreek Circle Saint Helena,
> > CA 94574
> > Phone: (310) 625-7242
> > Attention: William Summers
>
> If to A-CAP:
>
> > Ault Capital, LLC.
> > 23150 Fashion Drive
> > Suite 231
> > Estero, Florida 33928
> > Phone: (651) 600-4603
> > Attention: Mr. David Ault
>
> If to the Escrow Agent:
>
> > CKR LAW, LLP
> > 1330 Avenue of the Americas,
> > 14th Floor
> > New York, New York 10019
> > Phone: (212) 259-7300
> > Attention: Mr. Jeffrey A. Rinde

6

Company's Initials: WS          A-Cap's Initials: _____          Escrow Agent Initials: C K R

Any notice, except notice by the Escrow Agent, may be given on behalf of any parties by its counsel or other authorized representative. In all cases the Escrow Agent shall be entitled to rely on a copy or a fax transmission of any document with the same legal effect as if it were the original of such document.

**12.** **Modifications; Waiver**. This Agreement may not be altered or modified without the express prior written consent of all of the parties to this Agreement. No course of conduct shall constitute a waiver of any terms or conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified. A waiver of any of the terms and conditions of this Agreement on one occasion shall not constitute a waiver of the other terms of this Agreement, or of such terms and conditions on any other occasion.

**13.** **Further Assurances**. If at any time the Escrow Agent shall determine or be advised that any further agreements, assurances or other documents are reasonably necessary or desirable to carry out the provisions of this Agreement and the transactions contemplated by this Agreement, the Escrow Parties shall execute and deliver any and all such agreements or other documents, and do all things reasonably necessary or appropriate to carry out fully the provisions of this Agreement.

**14.** **Assignment**. This Agreement shall inure to the benefit of and be binding upon the successors, heirs, personal representatives, and permitted assigns of the parties. This Agreement is freely assignable by the Escrow Parties; provided, however, that no assignment by such parties, or it successors or assigns, shall be effective unless prior written notice of such assignment is given to the other parties, including, without limitation, the Escrow Agent; and provided, further, that any assignee satisfies the Escrow Agent's requirements set forth herein. This Agreement may not be assigned by the Escrow Agent, except that upon prior written notice to the Escrow Parties, the Escrow Agent may assign this Agreement to an affiliated or successor bank or other qualified bank entity.

**15.** **Section Headings**. The section headings contained in this Agreement are inserted for purposes of convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

**16.** **Governing Law/Disputes**. This Agreement shall be interpreted according to and subject to New York Law. The Escrow Parties agree to do their utmost to ensure that any disputes between them are settled equitably and amicably and where possible without resort to arbitration. In the event of any differences or dispute of whatever nature arising from this Agreement (which shall include any failure to agree on any matter which requires the Escrow Parties' agreement for the purposes of implementation of this Agreement) or any other matter related thereto which cannot be settled by direct negotiation within thirty (30) days after either of the Escrow Parties has notified the other parties in writing of the existence of the dispute, such differences or dispute shall be referred to and finally settled by binding arbitration in City, County and State of New York.

7

Company's Initials: WS      A-Cap's Initials: _____   Escrow Agent Initials: C K R

17.    **Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR RELATING TO THE SUBJECT MATTER HEREOF OR THEREOF. EACH OF THE PARTIES HERETO CERTIFIES THAT NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY SUCH LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER.**

18.    **Counterparts and Facsimile Execution.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes (and such signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes).

**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

8

Company's Initials: WS      A-Cap's Initials: _(signature)_      Escrow Agent Initials: C K R

**THE SUMERS GROUP, LLC**

BY: *William Summers*

NAME: William Summers
TITLE: Principal


**AULT CAPITAL, LLC**

BY: _____

NAME: David Ault
TITLE: Managing Partner


**CKR LAW, LLP - ESCROW AGENT**


BY: _____

NAME: Jeffrey A. Rinde
TITLE: Managing Partner

9

Transaction Code: _____
Lessor Code:
Lessee Code:

## ANNEX A

## BANK COORDINATES

## ESCROW AGENT

**Escrow Payment**

| | |
|---|---|
| Bank: | Signature Bank |
| Address: | 485 Madison Avenue, NY, NY 10022 USA |
| Account Name: | CKR LAW LLP Attorney Trust Account |
| Account No.: | 1503214942 |
| Name of Authorized Signatory: | Jeffrey A. Rinde |
| SWIFT Code: | SIGNUS33 |
| Bank Officer Name: | Joan McNulty |
| Bank Officer Title: | Group Director, Senior Vice President, Commercial and Private Banking |
| Telephone: | 646-981-2479 |
| Fax: | 646-560-4246 |
| Email: | jmcnulty@signatureny.com |

## THE SUMMERS GROUP, LLC

| | |
|---|---|
| Bank: | |
| Address: | |
| SWIFT: | |
| Account Name: | |
| Account No.: | |
| Account Signatory: | |
| IBAN CODE: | |
| Bank Officer: | |
| Telephone: | |
| Facsimile: | |
| Bank Officer Email: | |

10

Company's Initials:          A-Cap's Initials: _____   Escrow Agent Initials: C K R